UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| GREGORY  LACY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:12-cv-00819-LJM-DKL |
| | ) | |
| TIME DISPATCH SERVICES, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| ZACHARY  WRIGHT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:12-cv-01032-LJM-DKL |
| | ) | |
| TIME DISPATCH SERVICES, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| MISTIKAE ELIZABETH TIPTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:12-cv-01476-LJM-DKL |
| | ) | |
| PAUL T. MORRIS, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

1

## ORDER ON DEFENDANT DLS'S MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Defendant DLS Logistics, LLC's ("DLS") three separate Motions for Summary Judgment on the claims of negligence brought against it by Plaintiffs Gregory Lacy, Zachary Wright, and Mistikae Elizabeth Tipton (collectively "Plaintiffs). Each of the Plaintiffs alleges negligence against DLS, Time Dispatch Service, Inc. ("TDS"), and Paul Morris, following an accident in which a vehicle driven by Morris allegedly resulted in injuries to each of the Plaintiffs.[1]

For the reasons set forth below, the Court **DENIES** DLS's Motion for Summary Judgment.

### I.     BACKGROUND

### A.  RELATIONSHIP BETWEEN DLS AND TDS

Thomas "Cecil" Dennis is the sole owner of DLS. Dennis Dep. 18:17-18. DLS is in the trucking business and facilitates the movement of goods through dispatching and labor if it utilizes its own trucks. *Id.* 41:8-17. TDS is a motor carrier similar to DLS, but rather than employ its own drivers or purchase trucks, it relies on contracted agents, like DLS, to solicit business under its United States Department of Transportation ("DOT") authority. Dunn Dep. 26:14-23.

On April 21, 2010, DLS and TDS signed an Agent Agreement wherein DLS acted as TDS's agent and solicited "interstate and intrastate shipments of property for transportation in interstate and intrastate commerce." Dennis Dep. Pl.'s Ex. 26, ¶ 1 (hereinafter "Agent Agreement"). DLS was also responsible for "provid[ing] personnel,

---

[1] Each of the Plaintiffs brought a separate cause of action against DLS, TDS, and Morris.  DLS moved for summary judgment against all three Plaintiffs on the same grounds and filed the same brief in each cause of action.  Accordingly, the Court consolidates its findings with respect to DLS's motion in the interests of time and efficiency.

office space and telephone equipment, at it's [sic] expense sufficient to properly perform as Agent for Time Dispatch Services." *Id.* ¶ 5.  DLS also warranted that it would ensure compliance with the laws and regulations of the DOT. *Id.*  In turn, TDS represented that it was a Licensed Broker authorized by the DOT, which authorized brokerage and carrier operations in interstate commerce.  *Id.*  TDS provided that it would "fully control and be responsible for all shipments handled under its authority.  As any shipment is solicited by [DLS], the latter will inform Time Dispatch Services … of the origin and destination of said shipment and, if brokered, the identity of carrier to be utilized." *Id.* ¶ 3.  The Agent Agreement further provided that DLS would receive 85% of the gross revenue plus a 2% bonus minus Lessor pay as compensation for its service. *Id.* ¶ 12.

In August 2011, DLS purchased a 1995 Freightliner Truck. Dennis Dep. 26:14-23. On September 2, 2011, Dennis signed a TDS Truck Application Contract Operating Agreement, which listed DLS as the contractor and TDS as the carrier. Dennis Dep. Pl.'s Ex. 28 (hereinafter "Operating Agreement").  TDS did not sign the Operating Agreement. *Id.*; Dennis Dep. 27:12-28:16.  Nonetheless, TDS sent the hard license plate and the cab card to DLS, which Dennis interpreted as validating the Operating Agreement. Dennis Dep. 28:7-11.  At Dennis' instruction, DLS employee Paul Morris placed the TDS stickers on the truck. Morris Depo. 127:2-128:21.  The Operating Agreement states that "[TDS], a for-hire motor carrier, operating under authority issued by the Interstate Commerce Commission wishes to obtain transportation with equipment it does not own through an agreement with [DLS]." Operating Agreement.  It further stated that DLS agreed "to use all necessary labor to transport, load, and unload on behalf of such other carriers as [TDS] may designate." *Id.*, ¶ 1.  Under the Operating Agreement, DLS received 75% of the gross

revenue of all loads. *Id.*, ¶ 2. The Operating Agreement also stated that "[i]f an accident claim arises out of the driver's negligence the full responsibility of the claim with be [DLS]'s responsibility." *Id.*, ¶ 3.

Dennis testified that the Operating Agreement meant that DLS operated under TDS's DOT number and that TDS acted as the operating authority responsible for the load. Dennis Dep. 25:6-14. Dennis described TDS as a "silent partner banker," stating that TDS provided money up front along with insurance. *Id.* 40:24-41:7. In return, DLS provided dispatching services for the shipment, unless one of its trucks was assigned the task of delivering the shipment, as was the case the day of the accident, in which case it would also provide the driver and the vehicle. *Id.* 41:8-17.

## B. PAUL MORRIS' EMPLOYMENT WITH DLS

Dennis hired Paul Morris to be a truck driver sometime in 2009. Morris Dep. 16:16-23. At all times, Morris considered himself to be a DLS employee whose duty was to drive DLS trucks. *Id.* 34:19-35:7; 58:5-11. Dennis paid Morris weekly in cash. Dennis Dep. 52:1-5. Morris worked directly for Dennis and would do whatever task Dennis required of him. *Id.* 35:17-22; Morris Dep. 34:19-35:7. Morris stated that he only answered to Dennis, who he considered one in the same with DLS. Morris Dep. 43:14-44:10. In addition to driving trucks, Morris repaired and performed maintenance on DLS equipment. *Id.* 49:5-10. Morris also stayed in DLS's trailer and kept an eye on the property. *Id.* 65:7-66:21. Dennis provided Morris a universal key that worked on most of the Freightliner trucks. Dennis Dep. 36:11-18. Morris stated that he "always had permission to drive [Dennis'] vehicles" and that he was unaware of any of the insurance issues with respect to the trucks on the lot. Morris Dep. 80:17-81:19. Morris believed that

4

he had permission to drive all DLS trucks, including the Freightliner involved in the accident. *Id.* 76:5-16.

TDS approved Morris as a driver until he failed a drug screening, which resulted in termination of his eligibility to drive for TDS. *Id.* 48:4-22; Dennis Dep. 119:8-120:12.  TDS sent Morris a letter indicating that he was disqualified from driving for TDS. Morris Dep., Def.'s Ex. 25.   The letter stated that "DOT regulations require [TDS] to immediately remove you from performing any DOT safety-sensitive duties, including, but not limited to, Commercial Driving Duties.  This disqualification applies to performing any type of DOT safety-sensitive duties for **any** employer." *Id.*  The letter further admonished that, in order to resume his driving privileges, Morris would have to be evaluated by a Qualified Substance Abuse Professional. *Id.*

Morris did not receive the letter from TDS, but was informed by Dennis that he could no longer drive for TDS. Morris Dep. 77:24-78:16.   Even after receiving this information from Dennis, Morris believed he could still drive the TDS freight if so instructed by Cecil. *Id.* 78:17-25.  Indeed, approximately four months after the failed drug test, and without approval from TDS or evaluation by a Qualified Substance Abuse Professional, Morris resumed hauling TDS freight with Dennis' permission. *Id.* 87:12-89:8.   Dennis admitted that Morris, following the failed drug test and receipt of the TDS disqualification letter, had at least "pulled a few" TDS loads, although he could not recall how many. Dennis Dep. 14:5-18.  Morris stated, "Whatever [Dennis] wanted me to haul, I'd haul it." Morris Dep. 89:8.  Morris only answered to Dennis and did not have contact with TDS with respect to the hauling of TDS freight. *Id.* 88:13-22; 89:9-90:8.  Dennis believed that

at all times Morris was acting within the course and scope of his employment with DLS. Dennis Dep. 171:54-172:3.

Following Morris' termination by TDS, DLS reinstated its DOT operating authority and obtained insurance for a Volvo truck so that Morris could continue driving. *Id.* 34:4-9; 120:6-21.   Dennis does not recall whether he disclosed Morris' failed drug test to the insurance company when he sought to insure the Volvo truck with Morris as the driver. *Id.* 122:13-123:  Morris replaced the TDS stickers with DLS stickers on the Volvo. Morris Dep. 93:24-94:7.

### C.  SEPTEMBER 21, 2011 ACCIDENT

On September 21, 2011, Morris made a couple runs for Dennis in the Volvo. *Id.* 92:13-14.   During the second run, the steering column on the Volvo fell into his lap. *Id.* 92:14-16.   Morris informed Dennis that the Volvo's steering wheel fell off and that the "truck is done" and "that truck ain't going nowhere." *Id.* 100:17-22.   Morris and Dennis both went to evaluate the Volvo truck. *Id.* 100:23-25.   Morris testified that fixing the truck at that time of day was impossible. *Id.* 99:11-15.   Because the Volvo was disabled, the TDS-leased Freightliner was the only other truck available on September 21, 2011. *Id.* 74:18-20.

At approximately 9:00 p.m., Dennis informed Morris that a load needed to be delivered by midnight. *Id.* 76:17-77.   Another DLS employee and TDS-approved driver, Tom Baker, could not be reached to transport the load, despite both Morris and Dennis' efforts to contact him. Dennis Dep. 29:8-30:7.   If the load was not delivered by midnight, DLS could have received a penalty or potentially lost a customer. *Id.* 100:17-25.   Morris indicated that he could take the load, but reminded Dennis that he did not have a vehicle

at the time. Morris Dep. 74:6-9. In response, Dennis told Morris that the Volvo was not the only truck on the lot and gave him permission to haul the load in the TDS-leased Freightliner. *Id.* 74:21-75:10; Dennis Dep. 29:23-30:18. Morris believed that he had permission to drive the Freightliner at all times. *Id.* 80:22-24. As Dennis admitted, however, he could not authorize Morris to drive the TDS-leased truck, the only available truck at that time. Dennis Dep. 32:5-10; 45:16-24; 100:11-16. Dennis and Morris provided conflicting accounts as to whether Dennis knew that the Volvo was inoperable on the night of September 21, 2011, which left only the TDS-leased Freightliner truck available to haul the load. *Id.* 100:14-16; 117:25-118:11; *compare* Morris Dep. 74:4-75:4;100:6-25. That night, Morris began delivery of the load in the TDS-leased Freightliner tractor. Morris Dep. 86:12-15; 90:17-22.

At approximately 11:40 p.m., Morris crashed the TDS-leased Freightliner truck into the Plaintiffs. *Id.* 141:17-144:16. Immediately after the accident, Morris called Dennis to report it. *Id.* 144:8-18.

## II.      SUMMARY JUDGMENT STANDARD

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.E.2d 265 (1986). *See also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990). Motions for summary judgment are governed by Federal Rule of Civil Procedure 56(a), which provides in relevant part: The court shall grant summary judgment

if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials showing that a fact either is or cannot be genuinely disputed. Fed.R.Civ.P. 56(c)(1). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Oliver v. Oshkosh Truck Corp.,* 96 F.3d 992, 997 (7th Cir.1996). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying applicable evidence. *See Bombard v. Ft. Wayne Newspapers, Inc.,* 92 F.3d 560, 562 (7th Cir.1996).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm,* 94 F.3d 254, 257 (7th Cir.1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *JPM Inc. v. John Deere Indus. Equip. Co.,* 94 F.3d 270, 273 (7th Cir.1996). Irrelevant or unnecessary facts do not deter

summary judgment, even when in dispute. *See Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir.1992). If the moving party does not have the ultimate burden of proof on a claim, it is sufficient for the moving party to direct the court to the lack of evidence as to an element of that claim. *See Green v. Whiteco Indus., Inc.,* 17 F.3d 199, 201 & n. 3 (7th Cir.1994). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir.1996).

## III.   DISCUSSION

DLS seeks summary judgment on three separate theories.  It first argues that DLS had fulfilled its role under the Agency Agreement and therefore cannot be held liable for Morris' actions after he left the DLS lot in the TDS-leased Freightliner.  Similarly, DLS suggests that Morris was acting as a "borrowed servant" for TDS at the time of the collision.  Finally, DLS contends that TDS is solely liable for the accident as its placards were placed on the side of the Freightliner.  All three theories may be resolved by answering the following: what was Morris' relationship with DLS at the time the collision occurred?  The Court finds that this question is best left to the province of the jury for the following reasons.

### A.  TDS, DLS, AND MORRIS' EMPLOYMENT RELATIONSHIP

DLS first argues that it completed its responsibilities under the Agency Agreement after it provided the driver and equipment to TDS, at which point TDS assumed full control and responsibility for the load and actions of Morris.  DLS maintains that by and through

the Agency Agreement it negotiated with TDS, Morris and TDS developed a master-servant relationship thereby imputing Morris' alleged negligence to TDS as the principal.

"Agency is a relationship resulting from the manifestation of consent by one party to another that the latter will act as an agent for the former." *Smith v. Brown*, 778 N.E.2d 490, 495 (Ind. Ct. App. 2002).   Under Indiana law, "[t]o establish an actual agency relationship, three elements must be shown: (1) manifestation of consent by the principal; (2) acceptance of authority by the agent; and (3) control exerted by the principal over the agent." *Bauermeister v. Churchman*, 59 N.E.3d 969, 974 (Ind. Ct. App. 2016).   The party asserting the existence of an agency relationship bears the burden of proving its existence. *Id.*   "Whether an agency relationship exists is generally a question of fact, but if the evidence is undisputed, summary judgment may be appropriate." *Demming v. Underwood*, 943 N.E.2d 878, 884 (Ind. Ct. App. 2011).

DLS fails to designate any evidence to establish that an agency relationship existed between Morris and TDS.   DLS's attempt to utilize its own Agency Agreement that it entered into with TDS for the proposition that Morris and TDS in turn developed an agency relationship is unfounded.   The Agency Agreement contemplates an agency relationship between DLS and TDS and nothing more.   Morris was not privy to, nor subject to, the Agency Agreement. *See Corry v. Jahn*, 972 N.E.2d 907, 918 (Ind. Ct. App. 2012) ("The agent must acquiesce to the arrangement and be subject to the principal's control.").   At all times both Morris and Dennis believed Morris to be acting under the scope of his employment with DLS, not TDS.   In fact, the record shows that TDS explicitly prohibited Morris from driving on its behalf following his failed drug screening, yet DLS

10

provided him the authority to haul the load in question as it had a vested interest in the timely delivery of the shipment.

Even assuming that an agency relationship existed between TDS and Morris, DLS fails to explain how that fact would absolve DLS of its liability as Morris' employer. Dennis admitted that at all times Morris acted within the course and scope of his employment with DLS, which, as the Plaintiffs and Morris highlight, could subject DLS to vicarious liability. *See Robbins v. Trs. of Ind. Univ.*, 45 N.E3d 1, 6 (Ind. Ct. App. 2015) ("Vicarious liability will be imposed upon an employer under the doctrine of respondeat superior where the employee has inflicted harm while acting within the scope of employment.").

The doctrine of respondeat superior renders liable an employer that would not otherwise be liable for its own acts, but nonetheless "can be held liable for the wrongful acts of its employee which are committed within the scope of employment." *Knighten v. E. Chi. Hous. Auth.*, 45 N.E.32 788, 792 (Ind. 2015) (internal quotation marks omitted). An employee's conduct will fall within the scope of employment if the act that causes the injury is "incidental to the conduct authorized or it must, to an appreciable extent, further the employer's business." *Barnett v. Clark*, 889 N.E.2d 281, 283 (Ind. 2008). "Acts for which the employer is not responsible are those done on the employee's own initiative." *Stropes by Taylor v. Heritage House Childrens Ctr. of Shelbyville, Inc.*, 547 N.E.2d 244, 247 (Ind. 1989) (internal quotations omitted).

As already stated above, there is ample evidence to suggest that Morris could have been acting in the course and scope of his employment with DLS. Morris acted at the direction of DLS and for DLS's direct benefit. Moreover, Dennis provided Morris the authority to drive the load the night the accident occurred.

11

To overcome this hurdle, DLS attempts to establish that TDS "borrowed" Morris for the duration of the haul and is therefore liable for his actions undertaken on TDS's behalf. Indiana recognizes that "an employee while generally employed by one party, may be loaned to another in such a manner that the special employer may be responsible for the acts of the employee under the doctrine of respondeat superior." *N.Y.C. Cent. R.R. Co. v. N. Ind. Pub. Serv. Co.*, 221 N.E.2d 442, 446 (Ind. Ct. App. 1996). But the fact that a person becomes the borrowed servant of another does not necessarily sever the master-servant relationship between the original parties, for "a person may be the servant of two masters at one time as to one act, 'if the service to one does not involve abandonment of the service to the other.'" *Yeary v. United States*, 921 F.Supp 549, 558 (S.D. Ind. 1996) (citing *N.Y.C. Cent. R.R. Co.*, 221 N.E.2d at 446)).

This argument fails for the same reasons set forth above – DLS is unable to set forth any facts to demonstrate that Morris acted solely under the control and employ of TDS. There is no evidence to suggest that Morris had abandoned his work for DLS on September 21, 2011. Further, the fact that TDS may have had an employment relationship with Morris is immaterial to whether Morris was also acting as an employee of DLS. Consequently, there remains an issue of fact as to whether Morris acted as a DLS employee the night of the accident.

## B.  PLACARD LIABILITY

DLS's final argument is that, since the TDS-leased Freightliner bore TDS's placard at the time of the accident, it is solely liable for the negligence of the truck under placard liability. Once again, DLS attempts to use TDS's potential liability to escape accountability. It cannot do so.

12

Placard liability provides that motor carriers are vicariously liable for the negligent actions of a truck driver if the truck bears the motor carrier's DOT. *Rediehs Exp., Inc. v. Maple*, 491 N.E.2d 1006, 1010-11 (Ind. Ct. App. 1986). The purpose of placard liability is to provide injured parties a "quickly identifiable and financially accountable source of compensation." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 724 (7th Cir. 2015). But, as the Seventh Circuit recently noted, such liability is not exclusive to the motor carrier alone. "Just because a plaintiff can quickly identify and sue the company whose placard appeared on the vehicle that struck him does not mean that the same plaintiff cannot sue–and recover from–others who may be at fault." *Id.* at 724-25.

Indiana also follows this line of reasoning. In *Johnson v. Motors Dispatch, Inc.*, the Indiana Court of Appeals reversed a trial court's granting of summary judgment to a lessor that argued placard liability provides for liability against a lessee at the exclusion of other parties. 360 N.E.2d 224, 229-30 (Ind. Ct. App. 1977). The court held that a lessor, like DLS, "who is otherwise liable for said negligence is not released by the imposition of responsibility upon the lessee as well." *Id.* at 228. The *Johnson* court held summary judgment improper as to the lessor since the driver could have been the employee of both the lessor and lessee. *Id.* at 228-29.

The same reasoning holds true in this case. As stated more fully above, DLS fails to demonstrate that TDS's liability in this matter excuses its responsibility as Morris' employer. A question of fact remains as to Morris' employment status on the night in question and therefore summary judgment is inappropriate.

## IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant DLS's Motion for Summary Judgment.

IT IS SO ORDERED THIS 15th day of November, 2016.

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana


Distribution:

Pamela J. Hensler
CLENDENING JOHNSON & BOHRER P.C.
phensler@lawcjb.com

Belinda R. Johnson-Hurtado
CLENDENING JOHNSON & BOHRER P.C.
bhurtado@lawcjb.com

Lonnie D. Johnson
CLENDENING JOHNSON & BOHRER, P.C.
ljohnson@lawcjb.com

Samantha A. Huettner
CLENDENING JOHNSON & BOHRER, P.C.
shuettner@lawcjb.com

TaKeena Monette Thompson
COHEN & MALAD, LLP
tthompson@cohenandmalad.com

Keenan C. Fennimore
CRUSER MITCHELL & GASTON, LLC
kfennimore@cmlawfirm.com

Bruce D. Jones

CRUSER MITCHELL NOVITZ SANCHEZ & ZIMET, LLP
bjones@cmlawfirm.com

Keith A. Gaston
CRUSER MITCHELL NOVITZ SANCHEZ & ZIMET, LLP
kgaston@cmlawfirm.com

Sally R. Shadwick
CRUSER MITCHELL NOVITZ SANCHEZ & ZIMET, LLP
sshadwick@cmlawfirm.com

Danford Royce Due
DUE DOYLE FANNING  & METZGER
ddue@duedoyle.com

John R. Nelson
FOSTER PEPPER PLLC
422 W. Riverside Ave.
Suite 1310
Spokane, WA 92201

Orfej P. Najdeski
KOPKA PINKUS DOLIN & EADS, LLC
opnajdeski@kopkalaw.com

James H. Milstone
KOPKA, PINKUS DOLIN PC
jhmilstone@kopkalaw.com

Amanda L. Evans
LAW & MORAN
amanda@lawmoran.com

E. Michael Moran
LAW & MORAN
mike@lawmoran.com

Michael P Walker
LAW & MORAN
mwalker@lawmoran.com

Peter A. Law
LAW & MORAN
pete@lawmoran.com

Tim D. Mosby

LAW OFFICE OF THE LIBERTY MUTUAL GROUP
tim.mosby@libertymutual.com

Jenna C. Lower
LAW OFFICES OF THE LIBERTY MUTUAL GROUP
jenna.lower@libertymutual.com

Richard W. McMinn
LAW OFFICES OF THE LIBERTY MUTUAL GROUP
richard.mcminn@LibertyMutual.com

Mark A. Metzger
METZGER ROSTA LLP
mark@metzgerrosta.com

Thomas Edward Rosta
METZGER ROSTA LLP
Tom@metzgerrosta.com

Eric K. Habig
SCOPELITIS GARVIN LIGHT HANSON & FEARY PC
ehabig@scopelitis.com

Thomas E. Schulte
SCOPELITIS GARVIN LIGHT HANSON & FEARY PC
tschulte@scopelitis.com

Christopher R. Whitten
WHITTEN LAW OFFICE
cwhitten@indycounsel.com

James L. Culp
WHITTEN LAW OFFICE
jculp@indycounsel.com

Jason J. Hoy
WHITTEN LAW OFFICE
jhoy@indycounsel.com

Jennifer E. Davis
BRUCE P. CLARK & ASSOCIATES
jed@bpc-law.com


Donald J. Tribbett
TRIBBETT LAW OFFICE

djt@tribbettlaw.com

Matthew Ryan Dodson
mdodsonjd@gmail.com

Thomas David Collignon
COLLIGNON & DIETRICK PC
tcollignon@cdattorneys.com

Randall Godfrey Degan
DEGAN LAW P.C.
rdegan@cdattorneys.com

John K. McDavid
HOSTETTER & ASSOCIATES
john@hostetterlegal.com

Joel R. Hamner
MCCUTCHEON & HAMNER, PC
joel@mhatty.com